IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALEKSANDR F. ILIN,<br><br>    Plaintiff,<br><br> vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security Administration<br><br>    Defendant. | CV 14–159–M-DLC–JCL<br><br>FINDINGS & RECOMMENDATION |

Plaintiff Aleksandr Ilin brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-434.

## I.  Procedural Background

Ilin applied for benefits in June 2010, alleging disability since June 17, 2009, due to fibromyalgia and depression. (Tr. 19, 194, 243). Ilin's application was denied initially and on reconsideration, and he requested an administrative hearing. (Tr. 146-48, 150-41, 154-56 ). Ilin appeared with counsel at his hearing, and on September 4, 2012, the ALJ issued a decision finding that Ilin was not

-1-

disabled within the meaning of the Act. (Tr. 19-34). The Appeals Council denied Ilin's request for review, making the ALJ decision final for purposes of judicial review. (Tr. 1-6). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Ilin was 38 years old at the time of his alleged onset date, and 41 years old at the time of the ALJ's decision.

## II.  Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir.

2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

### III. <u>Burden of Proof</u>

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or

more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii).

If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## IV. Discussion

The ALJ found at step one that Ilin met the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since his June 2009 alleged onset date. (Tr. 21). At step two, the ALJ found that Ilin had the following severe impairments: fibromyalgia, degenerative changes of the lumbar spine, headaches, insomnia/sleep disorder, anxiety, and depression. (Tr. 21). The ALJ concluded at step three that Ilin did not have an

impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. (Tr. 22). The ALJ also found that while Ilin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects" of those symptoms were not credible to the extent they were inconsistent with his residual functional capacity assessment. (Tr. 24). The ALJ found that Ilin was capable of a limited range of light work. (Tr. 32). Based on that residual functional capacity assessment, the ALJ found that Ilin was not able to perform any of his past relevant work but could perform other jobs that exist in significant numbers in the national economy, including unskilled work as a bench assembler, motel cleaner, photocopy machine operator, addressing clerk, or document preparer. (Tr. 33-34).

    A.    **Medical Opinions**

Ilin argues the ALJ erred by not giving more weight to opinions provided by treating physicians Dr. Roger Diegel, Dr. Robert Nitschelm, and treating psychiatrist Dr. Victor Houser.

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An

examining physician's opinion in turn "carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). The weight given a treating or examining physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

The Commissioner may disregard a treating physician's opinion whether or not that opinion is contradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ may accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751.

1. <u>Dr. Roger Diegel</u>

Ilin first saw Dr. Roger Diegel on July 8, 2009 for evaluation of myalgias. (Tr. 320-21). Ilin told Dr. Diegel that he had suffered from myalgias and bony pain for years, but that his symptoms had worsened following a left knee MRSA infection in 2007. (Tr. 320). Dr. Deigel thought that Ilin might have fibromyalgia

or a chronic pain syndrome and prescribed Cymbalta. (Tr. 321). When Ilin reported a few weeks later that Cymbalta was causing him headaches and insomnia, Dr. Diegel prescribed Lyrica instead. (Tr. 319). Ilin followed up with Dr. Diegel on August 5, 2009, at which time Dr. Diegel encouraged him to continue exercising and referred him to psychiatrist Dr. Victor Houser "to see if depression or other issues may be affecting the pain." (Tr. 319). Ilin saw Diegel approximately once a month for the next several months, during which time Ilin generally reported that his symptoms were improving although he had some intermittent periods of increased pain. (Tr. 309-18).

Ilin argues the ALJ erred by not giving more weight to several forms completed by Dr. Diegel. In September 2009, for example, Dr. Diegel completed a Long-term Disability Claim Physician's Statement form on which he stated that Ilin "cannot concentrate for 8 hours at work." (Tr. 677). He indicated that Ilin could sit, stand, and walk for only one hour each during an eight hour workday. (Tr. 677). At a follow up appointment in December 2009, Dr. Diegel wrote that Ilin could start working on a part time basis, to "see how he does, starting at about 2 hours per day." (Tr. 315). Approximately one month later, in January 2010, Dr. Diegal completed an Authorization to Return to Work form on which he indicated by check-mark that Ilin was unable to work. (Tr. 671). In November 2010, Ilin

advised Dr. Diegel he was unable to "work because he can't concentrate" and Dr. Diegel wrote on a form entitled "Certification of Health Care Provider for Employee's Serious Health Condition" that Ilin was "currently not working" and was unable to perform his job functions because he could not concentrate. (Tr. 310, 673-75). Finally, in January 2011, Dr. Diegel completed another Authorization to Return to Work form on which he again indicated by check-mark that Ilin was unable to work. (Tr. 670).

To the extent Dr. Diegel was of the opinion that Ilin could not return to his past relevant work, which involved "very detailed bookkeeeping work," the ALJ agreed. (Tr. 30). The ALJ found at step four that Ilin could not perform any of his past relevant work, and expressly accommodated for Ilin's concentration problems by limiting him to work involving "simple, routine, repetitive tasks only." (Tr. 23). The ALJ reasonably found that while Dr. Diegel did not believe Ilin was capable of returning to his bookkeeping work, it was not clear from his responses whether he felt Ilin "could perform other work that did not require such a high level of concentration." (Tr. 30). To the extent Dr. Diegel's opinions might be read as precluding Ilin from all work activity, the ALJ gave them little weight because they were not supported by the medical evidence or Dr. Diegel's treatment notes. As the ALJ noted, for example, Dr. Diegel found when

examining Ilin in January 2011 that he had 5/5 muscle strength in his upper and lower extremities and advised Ilin that with exercise he should be able to return to work. (Tr. 30, 323). The ALJ also pointed out that Ilin advised Dr. Diegeal in March 2011 that he was applying for disability and wanted to know if there were exam findings of joint swelling, to which Dr. Diegel responded there were not. (Tr. 26, 669).

The ALJ also found it significant that Dr. Diegel made clear both in his treatment notes on the Authorization to Return to Work form he completed in January 2011 that his opinion was based in large part on Ilin's self-described limitations. Dr. Diegel wrote in his notes from January 28, 2011, that Ilin advised him he was unable to work, and on the Authorization to Return to Work form he completed that day Dr. Diegel again wrote that Ilin stated he was in too much pain to work or concentrate. (Tr. 670). As discussed below, the ALJ provided clear and convincing reasons for finding Ilin less than entirely credible. Having done so, the ALJ reasonably discounted Dr. Diegel's opinions to the extent they were premised on Ilin's self-described symptoms and limitations. The ALJ thus provided specific and legitimate reasons supported by substantial evidence for discounting Dr. Diegel's form opinions.

2.   Dr. Robert Nitschelm

Ilin next argues the ALJ did not give enough weight to a questionnaire completed by treating physician Dr. Robert Nitschelm. Ilin saw Dr. Nitschelm for the first time in March 2011 for treatment of his myalgias and insomnia. (Tr. 326). Dr. Nitschelm noted that Ilin appeared fatigued but was in no acute distress. (Tr. 326). Ilin saw Dr. Nitschelm again approximately six more times between March 2011 and January 2012 for treatment of his insomnia, fatigue, and fibromyalgia. (Tr. 769-70, 771-82). Dr. Nitschelm identified a "[w]ax and wane pattern" associated with Ilin's fibromyalgia, and consistently described Ilin's as appearing pleasant, tired, in no acute distress, and with a slightly flattened affect. (Tr. 771-82). In January 2012, Dr. Nitschelm emphasized the importance of a proper sleep pattern, good hydration, a healthy diet, and exercise. (Tr. 771). During the most recent examination of record in April 2012, Dr. Nitschelm again identified Ilin's chronic myalgias, fibromalgia and fatigue as his primary problems. (Tr. 785-86).

Approximately one month later, in May 2012, Dr. Nitschelm completed a questionnaire provided by Ilin's counsel on which he circled a response indicating that Ilin's symptoms would "Constantly (>66%)" interfere with his ability to pay attention and concentrate. (Tr. 794). Dr. Nitschelm also indicated by check-mark that Ilin could not perform light or sedentary work on a sustained full-time basis without 3 or more work absences a month. (Tr 795).

The ALJ considered Dr. Nitschelm's opinion and gave it moderate weight. As the ALJ correctly pointed out, Dr. Nitschelm stated on the questionnaire that Ilin's medications caused sedation as a side effect, which is what interfered with his ability to concentrate. (Tr. 32, 794). The ALJ agreed it was "clear that [Ilin] requires a job that does not require him to concentrate on complex tasks, which is consistent with Dr. Nitchelm's opinion that [Ilin's] medication can cause drowsiness." (Tr. 32). As discussed above, the ALJ accounted for the side effects of Ilin's medication by limiting him to work involving simple, routine, repetitive tasks. (Tr. 23). To the extent Dr. Nitschelm identified limitations that were inconsistent with the ability to perform any substantial gainful activity whatsoever, the ALJ permissibly rejected his opinion because it was not consistent with the medical evidence, including his own treatment notes. (Tr. 32).

### 3. Dr. Victor Houser

Psychiatrist Dr. Victor Houser examined Ilin for the first time in April 2010, on referral from Dr. Deigel. (Tr. 307). Dr. Houser diagnosed Ilin with major depressive disorder without psychotic features, and prescribed Lexapro. (Tr. 308). Dr. Houser saw Ilin on average once every month or two for the next two years, adjusting his medications as needed. (Tr. 304-07, 329-31, 688-91, 718-23). During that period Dr. Houser consistently assigned Ilin a GAF score of 60,

indicating no more than moderate symptoms or functional difficulties.

In May 2012, Dr. Houser completed a mental residual functional capacity questionnaire on which he indicated Ilin was unable to meet competitive standards in several mental functional categories, would miss more than four days of work each month, and assigned him a GAF of 40-45.[1] (Tr. 788-92).

To the extent Dr. Houser stated that Ilin would have difficulty managing stress and changes in routine, the ALJ expressly gave Dr. Houser's opinion significant weight. (Tr. 31). The ALJ accounted for those limitations in his residual functional capacity assessment, limiting Ilin to "work in a low-stress environment with no more than occasional decision-making or changes in the work setting" and involving simple, routine, and repetitive tasks. (Tr. 23). The ALJ also gave moderate weight to Dr. Houser's opinion regarding Iln's ability to work with and around others, limiting him to work involving no more than brief and superficial contact with the public. (Tr. 23, 31).

While the ALJ thus accepted portions of Dr. Houser's assessment, he rejected other portions of his opinion. In particular, the ALJ gave little weight to Dr. Houser's opinion regarding Ilin's mental ability to perform the tasks

---

[1] A GAF of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequents shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

associated with unskilled work because, as Dr. Houser made clear, he had not seen Ilin "in a work setting and ha[d] no accurate way to assess" Ilin's abilities, which were just "estimates" on Dr. Houser's part. (Tr. 31, 790).

The ALJ also pointed out that while Dr. Houser stated on the questionnaire that Ilin's GAF was 40-45, he had consistently assigned Ilin a GAF of 60 in his treatment notes. (Tr. 31). In fact, the ALJ noted that just three months before he completed this questionnaire, Dr. Houser had assigned Ilin a GAF o f60. The ALJ reasonably found that Dr. Houser's evaluation was not consistent with his treatment notes. (Tr. 31).

To the extent Dr. Houser's opinion suggested that Ilin's limitations were more severe than those set forth in the residual functional capacity assessment, the ALJ provided specific and legitimate reasons supported by substantial evidence for discounting his opinion.

### B. Credibility

Ilin argues the ALJ did not provide sufficiently clear and convincing reasons for discrediting his testimony. If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about

the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted). Ilin met his initial burden because he provided evidence that he has underlying impairments that could reasonably be expected to produce some degree of symptoms, and the ALJ did not find that he was malingering.

Ilin testified that he cannot work due to fatigue and pain. He said that he sleeps only two to three hours each night, and is fatigued during the day and cannot concentrate. He stated that he suffers from blurry vision due to his insomnia and medications, and after doing something for five to ten minutes his eyes start to burn. (Tr. 87). He described waking up every morning and experiencing "widespread pain" in "every spot" in his body. (Tr. 91). Ilin testified that he spends most of his days resting in his recliner or in bed. (Tr. 96).

The ALJ considered Ilin's testimony but found it to be less than entirely credible in part based on inconsistencies between Ilin's written statements and his hearing testimony. (Tr. 29). For instance, the ALJ noted that while Ilin reported he does not answer the phone and does not want to see people or have people see him, he testified that he goes shopping with his daughter and regularly attends church. (Tr. 29, 98, 257). The ALJ also noted that while Ilin reported he did not

like being around people, his employee records showed that he had an 8/10 attitude towards coworkers, supervisors, leads, and people from other departments." (Tr. 25). And while Ilin stated in his written reports that he had neck and back pain almost every day, the ALJ noted that Ilin also stated he had that "level of pain when he was working but was still able to perform detailed work in a variety of accounting and bookkeeping tasks." (Tr. 27).

The ALJ also discounted Ilin's testimony as to the debilitating extent of his symptoms in part because it was not consistent with the medical record. (Tr. 29). As the ALJ noted, for example, while Ilin claimed his anxiety and depression were of debilitating severity, Dr. Houser consistently assigned him a GAF of 60, which was indicative of only moderate limitations. And while Ilin testified that he has blurry vision, doctors did not find any problems with his eyes. (Tr. 27, 726-30). The ALJ discussed all of the medical evidence at length in his decision and ALJ reasonably found that it was not consistent with Ilin's allegations of debilitating pain and fatigue.

These were sufficiently clear and convincing reasons, supported by substantial evidence, for finding Ilin less than entirely credible.

**C. Lay Testimony**

Ilin contends the ALJ did not provide germane reasons for discounting his

wife's lay witness statement.

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)). "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919). Competent lay witness testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). Nonetheless, "an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims.'" *Molina v. Astrue*, 674 F.3d at 1122 (quoting *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).

Ilin's wife, Yuliya Ilin, submitted a written statement in support of her husband's disability application. (Tr. 297). She wrote that Ilin has insomnia, and sleeps only three to five hours a night. (Tr. 297). She said that Ilin has constant flu-like pain throughout his body, is fatigued, dizzy, and drowsy at lest half of the day, and no longer socializes like he used to. (Tr. 29).

The ALJ considered Yuliya Ilin's statement and gave it moderate weight.

(Tr. 32). To the extent he rejected her statement, he did so because her observations were premised in large part on Ilin's subjective complaints. Even if this was not a sufficiently germane reason for discrediting Yuliya Ilin's statement, any error was harmless because the same evidence that the ALJ referred to in discrediting Ilin's testimony also discredits Yuliya Ilin's statements. *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012). The Court thus concludes that any error on the ALJ's part in not providing germane reasons for discounting the lay witness testimony was harmless. *See Molina,* 674 F.3d at 1122 (ALJ's failure to consider lay witness testimony was harmless where that testimony "did not describe any limitations beyond those" described by the claimant, "which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons.")*; Valentine v. Commissioner Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (upholding rejection of family member's testimony, which was similar to the claimant's).

    D.    **Vocational Expert**

Finally, Ilin argues the ALJ's hypothetical to the vocational expert was flawed because it did not incorporate all of his alleged limitations. But because the ALJ properly discredited Ilin's testimony and his residual functional capacity assessment was supported by substantial evidence, the ALJ was not required to

include all of Ilin's alleged limitations. *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence).

## V. Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS RECOMMENDED that Ilin's motion for summary judgment be DENIED and the Commissioner's decision be affirmed.

DATED this 8th day of January, 2015

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge